UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                )
ATILA ADOLFO TIGGES, on behalf of   )
himself and all others similarly    )
situated,                           )
                                )
                 Plaintiffs,    )      CIVIL ACTION
                                )      NO. 16-10136-WGY
     `                          )
                                )
            v.                  )
                                )
AM PIZZA, INC. and HENRY ASKEW,     )
                                )
                 Defendants.    )
_____)


_____
                                )
TYLOR REEVES, on behalf of          )
himself and all others similarly    )
situated,                           )
                                )
                 Plaintiffs,    )      CIVIL ACTION
                                )      NO. 16-10474-WGY
                                )
                                )
            v.                  )
                                )
PMLRA PIZZA, INC. and HENRY ASKEW,  )
                                )
                 Defendants.    )
_____)
```

YOUNG, D.J.                                    July 29, 2016

**MEMORANDUM OF DECISION**

I.   **INTRODUCTION**

     These two separate but related class actions are but the

most recent expressions of a long-standing dispute between

certain Domino's pizza delivery drivers and their Domino's

franchise employers.  On May 23, 2016, this Court held a single
status conference for both actions.  Tr. Status Conference,
Tigges v. AM Pizza, Inc., No. 16-10136-WGY ("Tigges"), ECF No.
33; Tr. Status Conference, Reeves v. PMLRA Pizza, Inc., No. 16-
10474-WGY ("Reeves"), ECF No. 23.  One was filed by named
Plaintiff Atila Adolfo Tigges ("Tigges") against his former
employers, AM Pizza, Inc. ("AM Pizza") and Henry Askew ("Askew")
(collectively, the "Tigges Defendants").  The other was filed by
named Plaintiff Tylor Reeves ("Reeves"), also against his former
employers, PMLRA Pizza, Inc. ("PMLRA Pizza") and Askew, who is
the president of both Domino-franchise employers (collectively,
the "Reeves Defendants").

These two cases have a lot of overlap, especially in the
legal arguments made.[1]  Accordingly, when they advance identical
arguments, the Court will refer to Tigges and Reeves
collectively as the "Plaintiffs."  Similarly, the Tigges
Defendants and the Reeves Defendants too will be referred to
collectively as the "Defendants," when appropriate, so as to
avoid redundancy.

---

[1] Both Tigges and Reeves are former pizza delivery drivers,
their complaints are based on the same statutory violations, and
they are represented by the same attorney.  See Decl. Henry
Askew ¶¶ 2, 4, Tigges, ECF No. 3; Decl. Henry Askew ¶¶ 2, 4,
Reeves, ECF No. 3; State Court R., Class Action Compl., Tigges,
ECF No. 7; State Court R., Class Action Compl., Reeves, ECF No.
12.

The two complaints, each a putative class action, allege that the "delivery charge" imposed on the Defendants' customers was in fact a "service charge" that the Defendants failed to pay to their delivery drivers, in violation of Massachusetts General Laws chapter 149 (the "Tips Act"), and Massachusetts General Laws chapter 151 (the "Minimum Wage Act").  Class Action Compl. ¶ 1, Tigges; Class Action Compl. ¶ 1, Reeves.

At the May status conference, before the Court were the Plaintiffs' motions for class certification and the Defendants' motions to dismiss.  The Court granted Tigges's motion for certification of the class of delivery drivers employed by the Tigges Defendants that had not signed arbitration agreements, and Reeves's motion for certification for the class of delivery drivers employed by the Reeves Defendants that had signed arbitration agreements (limited by the applicable statutes of limitations).  Tr. Status Conference 6, 14-18, May 23, 2016, Tigges, ECF No. 33.  The Court also denied the Defendants' motions to dismiss.  See id.  The Reeves Defendants' motion to dismiss had an additional argument from the Tigges Defendants': that an arbitration agreement precluded Reeves from bringing a class action.  The Court ruled, inter alia, that the class action waiver in the arbitration agreement signed by Reeves and other employees was unenforceable because collective action is "the very essence of labor rights" granted to employees under

the National Labor Relations Act.  Elec. Clerk's Notes, <u>Reeves</u>, ECF No. 22.  This memorandum explains the Court's reasons for the above decisions.

### A.  Factual Background[2]

The Defendants are two Domino's franchisees that share the same president, Henry Askew.  Decl. Henry Askew ¶¶ 2, 4, <u>Tigges</u>, ECF No. 3; Decl. Henry Askew ¶¶ 2, 4, <u>Reeves</u>, ECF No. 3.  Both franchisees operate multiple Domino's locations in Massachusetts and have employed hundreds of delivery drivers.  Decl. Henry Askew ¶¶ 6, 7, <u>Tigges</u>; Decl. Henry Askew ¶¶ 6, 7, <u>Reeves</u>.

The Tigges Defendants employed Tigges as a delivery driver between 2008 and 2013.  Class Action Compl. ¶ 6, <u>Tigges</u>.  Reeves was also a delivery driver, employed by the Reeves Defendants between 2014 and 2015.  Class Action Compl. ¶ 6, <u>Reeves</u>.  The Reeves Defendants presented some of their employees, including Reeves, with a contract under which the employees would have to bring any action against their employer through individual arbitration (unless they exercised their right to opt-out of the

---

[2] This memorandum of decision covers both a motion to dismiss and a motion to certify a class.  As to the former, all of the Plaintiffs' well-pled factual assertions are accepted as true; as to the latter, the Court may engage in some limited preliminary fact-finding.  <u>See, e.g.</u>, <u>In re New Motor Vehicles Canadian Exp. Antitrust Litig.</u>, 522 F.3d 6, 17 (1st Cir. 2008).  As the parties do not quarrel over the basic background facts, the factual recitation above relies on the Plaintiffs' complaints, along with exhibits and declarations.

agreement).  See Mem. Supp. Defs.' Mot. Dismiss Pl.'s Compl.
Compel Arbitration ("Defs.' Mem. Dismiss"), Ex. 1, Ex. A,
Arbitration Agreement ("Arb. Agreement"), Reeves, ECF No. 10-1.

The Defendants pay their delivery drivers a "tipped minimum
wage," i.e., a wage that is lower than the regular minimum wage,
but that is supplemented by tips.  Class Action Compl. ¶ 6,
Tigges; Class Action Compl. ¶ 6, Reeves; Decl. Henry Askew ¶¶ 9-
11, Reeves.  The two entities also impose a delivery charge on
their customers that varies between $1.99 and $2.99.  See Class
Action Compl. ¶ 8, Tigges; Class Action Compl. ¶ 8, Reeves.
Customers are informed about this delivery charge through
disclosures on Domino's website, smartphone app, and on the
pizza boxes themselves.  Class Action Compl. ¶¶ 11-13, Tigges;
Class Action Compl. ¶¶ 11-13, Reeves.  Information about each
order is recorded on Domino's PULSE system and includes: the
date and time of each order, the amount of the order, the driver
who made the delivery, the amount of any delivery charge and any
credit card tips.  Class Action Compl. ¶ 15, Tigges; Class
Action Compl. ¶ 15, Reeves.

### B.   Litigation History

Prior to the filing of the instant putative class action
lawsuits, several other pizza delivery drivers had tried their
hands at virtually identical putative class actions against the
Reeves Defendants and their franchiser, Domino's (collectively,

the "Prior Defendants"), alleging violations of the Minimum Wage Act and Section 152A of the Tips Act stemming from the Prior Defendants' failure to pay their pizza delivery drivers the full amount of the "delivery charge."[3]

On August 8, 2013, a former Domino's-PMLRA driver, Eduardo Carpaneda ("Carpaneda"), filed the first putative class action against the Reeves Defendants and Domino's in the Massachusetts Superior Court sitting in and for the County of Middlesex. See State Court R., Class Action Compl., Carpaneda v. Domino's Pizza, Inc., 991 F.Supp.2d 270 (D. Mass. 2014) (No. 13-12313-WGY) ("Carpaneda"), ECF No. 14.  The Prior Defendants removed the action to this Court and shortly after filed a motion to dismiss the complaint.  Notice Removal, Carpaneda, ECF No. 1; Mot. Dismiss, Carpaneda, ECF No. 17.  The Court denied the Prior Defendants' motion to dismiss in a published opinion.  See Carpaneda, 991 F.Supp.2d at 270-275.  During the first, individual phase of this Court's bifurcated procedure for class actions,[4] the Prior Defendants served Carpaneda with an offer of judgment under Federal Rule of Civil Procedure 68 in the amount

---

[3] Stephen Churchill, counsel for Tigges and Reeves, was counsel for the plaintiffs in each of the past class action lawsuits discussed in this section.

[4] See infra note 12 for a discussion of this Court's class action procedure.

of $ 19,500, which he accepted.[5]  Agreement J., <u>Carpaneda</u>, ECF
No. 51.  Before the Court entered judgment, Carpaneda attempted
to amend his complaint and substitute another pizza delivery
driver, Marilia Prinholato ("Prinholato"), as named plaintiff
and potential class representative.  Pl.'s Mot. Am. Compl. 1,
<u>Carpaneda</u>, ECF No. 50.  The Court denied the motion and a
subsequent motion for reconsideration.  Elec. Order, <u>Carpaneda</u>,
ECF No. 53; Elec. Order, <u>Carpaneda</u>, ECF No. 64.

   On June 11, 2014, Prinholato then promptly filed a second
class action complaint, this time in federal court, raising the
same claims against the Prior Defendants, which she amended to
add a count of retaliation on June 25, 2014.[6]  Class Action
Compl., <u>Prinholato</u> v. <u>Domino's Pizza, Inc.</u>, No. 14-12483-WGY (D.
Mass. June 11, 2014) ("<u>Prinholato</u>"), ECF No. 1; Am. Compl.,
<u>Prinholato</u>, ECF No. 6.  On November 6, 2014, the Prior
Defendants made an offer of judgment to Prinholato in the amount
of $46,500, which she accepted.  Agreement J., <u>Prinholato</u>, ECF
No. 23; Agreement J., Ex. 1, Notice Acceptance Offer J.,
<u>Prinholato</u>, ECF No. 23-1.

---

[5] Since Carpaneda was picked off during the individual phase
of the Court's class action procedure, he did not have the
opportunity to file a motion for class certification.

[6] The Plaintiffs allege that on June 17, 2014, the Prior
Defendants made an initial offer of judgment to Prinholato,
which was refused.  Pl.'s Mot. Class Certif. 6, <u>Tigges</u>, ECF No.
20; Pl.'s Mot. Class Certif. 6, <u>Reeves</u>, ECF No. 6.

On April 13, 2015, Edione Lisandro ("Lisandro"), another former pizza delivery driver, filed a third class action complaint, raising the same claims.  Class Action Compl., Lisandro v. Domino's Pizza, Inc., No. 15-11584-WGY (D. Mass. April 13, 2015) ("Lisandro"), ECF No. 1.  Apparently, the Prior Defendants were done making offers for judgment.  Lisandro filed a motion for class certification, which was opposed.  Mot. Certify Class, Lisandro, ECF No. 4; Opp'n Mot. Certify Class, Lisandro, ECF No. 33.  Lisandro's case proceeded apace to an exemplar trial.  On October 23, 2015, six months after Lisandro's original complaint was filed, the jury found for the Prior Defendants on all claims.  Jury Verdict, Lisandro, ECF No. 80.  Because Lisandro lost the exemplar trial, the Court dismissed his motion for class certification, as he was hardly an adequate class representative.  Elec. Order, Lisandro, ECF No. 90.  The Court then entered judgment against Lisandro.  J., Lisandro, ECF No. 92.

### C.  The Instant Actions

On November 13, 2015, Tigges filed a complaint in the Massachusetts Superior Court sitting in and for the County of Middlesex.  Class Action Compl., Tigges.  Reeves followed with his class action complaint in the same forum on January 7, 2016.  Class Action Compl., Reeves.  Both complaints allege two counts, brought pursuant to Section 150 of the Tips Act, and Section 20

of the Minimum Wage Act.  See Class Action Compl. 6, Tigges;
Class Action Compl. 6, Reeves.  The complaints allege the same
violations as discussed above, see supra Part I-B, and for the
first time raise a new claim related to notice requirements
under the Minimum Wage Act.  Class Action Compl. 6, Tigges;
Class Action Compl. 6, Reeves.

In Count I, the Plaintiffs allege that the Defendants'
retention of the "delivery charge" paid by customers violated
Section 152A of the Tips Act.  Class Action Compl. 6, Tigges;
Class Action Compl. 6, Reeves.  In Count II, pursuant to
Sections 1 and 7 of the Minimum Wage Act, the Plaintiffs allege
that the Defendants' failure to pay their delivery drivers the
"delivery charge" and comply with applicable notice requirements
prohibited the Defendants from paying their drivers the "tipped
minimum wage."  Class Action Compl. 6, Tigges; Class Action
Compl. 6, Reeves.

On January 29, 2016, the Tigges Defendants removed the
action brought against them to federal court, followed by the
Reeves Defendants' removal on March 7, 2016.  Notice Removal,
Tigges, ECF No. 1; Notice Removal, Reeves, ECF No. 1.  On
February 16, 2016, the Tigges Defendants moved partially to
dismiss Tigges's complaint and shortly thereafter Tigges filed a
motion to remand the case to the Massachusetts Superior Court.
Mot. Dismiss (Partial), Tigges, ECF No. 12; Mot. Remand, Tigges,

ECF No. 16.  The Court denied both motions at hearings on March 25 and May 5, 2016, respectively.[7]  Elec. Order, <u>Tigges</u>, ECF No. 23; Elec. Clerk's Notes, <u>Tigges</u>, ECF No. 29.

On March 23, 2016, both Tigges and Reeves moved to certify their respective classes under Rule 23(b)(3) of the Federal Rules of Civil Procedure, Mot. Certify Class 3, <u>Tigges</u>, ECF No. 20; Mot. Certify Class 3, <u>Reeves</u>, ECF No. 6, which the Defendants opposed in each case, Opp'n Mot. Certify Class, <u>Tigges</u>, ECF No. 28; Opp'n Mot. Certify Class, <u>Reeves</u>, ECF No. 16.  Tigges sought to certify a class consisting of "all individuals who worked as delivery drivers for [the Tigges Defendants] at any time [since] August 12, 2012[.]"  Mot. Certify Class 17, <u>Tigges</u>.  Reeves requested class certification for all individuals employed as delivery drivers by the Reeves Defendants at any time since December 31, 2010.  Mot. Certify Class 17, <u>Reeves</u>.

On March 25, 2016, the Reeves Defendants moved to dismiss Reeves' complaint, Mot. Dismiss Compl., <u>Reeves</u>, ECF No. 9, arguing that the Court lacks jurisdiction because (1) the previous class action brought by Lisandro barred Reeves's

---

[7] At the May 5, 2016 hearing, the Court requested that the parties submit further briefing, which they did, on the question of waiver of the right to invoke arbitration.  Elec. Clerk's Notes, <u>Reeves</u>, ECF No. 17; Defs.' Br. Concerning Waiver  Supp. Defs.' Mot. Dismiss Compl., <u>Reeves</u>, ECF No. 18; Pl.'s Supp. Mem. Opp. Def.'s Mot. Dismiss, <u>Reeves</u>, ECF No. 20.

current action via issue preclusion, and (2) Reeves signed a

binding arbitration agreement (the "Arbitration Agreement") that

precluded participation in class actions based on claims within

the scope of the Arbitration Agreement.  Defs.' Mem. Dismiss 1,

Reeves.  On May 23, 2016, the Court denied the Reeves

Defendants' motion to dismiss.  See Elec. Clerk's Notes, Reeves,

ECF No. 22.  The Court also certified the following classes[8]: in

the Tigges class action, a class of delivery drivers that are

not signatories of the Arbitration Agreement where the class

cut-off date is as required by the Tips Act and the Minimum Wage

Act statute of limitations, that is August 12, 2012,[9] and, in the

Reeves class action, a class of delivery drivers that are

signatories of the Arbitration Agreement where the class cut-off

date is statutory -- January 7, 2013 -- for the Minimum Wage Act

notice-requirement claim, and December 31, 2010 (the

---

[8] At the May 23, 2016 status conference, the Court decided
the statutory and legal framework for determining the class cut-
off dates but did not compute the precise calendar dates; the
Court now provides the exact temporal limitations for the
certified classes.

[9] Both the Tips Act and the Minimum Wage Act claims have a
three year statute of limitations tolled by the filing of a
complaint with the Massachusetts Attorney General's Office.
Mass. Gen. Laws ch. 149, § 150; Mass. Gen. Laws ch. 151, § 20A.
Tigges asserts and the Tigges Defendants do not dispute that,
prior to filing the complaint in state court, Tigges had filed a
wage complaint with the Massachusetts Attorney General's Office
on August 12, 2015, tolling the class cut-off date to August 12,
2012.  Mot. Certify Class 3 n.3, Tigges.

commencement of the first putative class action) for the other claims that had been asserted in the previous class action lawsuits.[10]   See Tr. Status Conference, 6:1-3, 14-18, Tigges.

## II.  ANALYSIS

The Court discusses three legal issues in this section. First, it deals with the Reeves Defendants' issue-preclusion argument, advanced in their motion to dismiss.  Next, the Court applies the Rule 23 factors to the classes it certified in the May 23, 2016 hearing.  Finally, the Court explains why the Reeves Defendants are not entitled to dismissal based on their arbitration agreements with Reeves and other employees.

### A.   Issue Preclusion

The Reeves Defendants argue that Reeves's class action is precluded by the Court's previous decision to dismiss Lisandro's putative class action after the jury returned its verdict for

---

[10] The Court ruled from the bench that the claims that were asserted in the previous Carpaneda, Prinholato and Lisandro cases against PMLRA Pizza and Askew (in addition to Domino's) benefit from tolling to the date of the first putative class action, December 31, 2010, but no such benefit applies to the newly asserted claim.  Tigges, Tr. Status Conference 16:2-8. The Court also notes that the Reeves Defendants have not opposed the Court's tolling of the statute of limitations for these claims in written submissions or at the status conference.
In the absence of information in the motion for class certification as to when Reeves filed a wage complaint with the Massachusetts Attorney General's Office prior to the instant civil complaint, the Court computes the cut-off date for the Minimum Wage Act claim from the date of the filing of the instant class action.

the Prior Defendants at Lisandro's exemplar trial.  Defs.' Mem.
Dismiss 10, <u>Reeves</u>.

Under Massachusetts law, applicable here,[11] "issue
preclusion provides that when an issue has been actually
litigated and determined by a valid and final judgment, and the
determination is essential to the judgment, the determination is
conclusive in a subsequent action between the parties whether on
the same or different claim."  <u>Jarosz</u> v. <u>Palmer</u>, 436 Mass. 526,
530-31 (2002) (internal citation omitted).  Here, however, the
parties are not the same, although the lawyers are.  The Reeves
Defendants, in asserting that "issue preclusion prevents the re-
litigation of claims asserted in the instant action on behalf of
'all others similarly situated[,]'" Defs.' Mem. Dismiss 9,
<u>Reeves</u>, misunderstand the Court's ruling in <u>Lisandro</u>: the
exemplar trial conducted by the Court concerned only Lisandro's

---

[11] Because the preclusive effect of a federal court's prior
judgment is at issue, the Court turns to federal common law for
guidance.  <u>See</u> <u>Glob. NAPs, Inc.</u> v. <u>Verizon New England Inc.</u>, 603
F.3d 71, 95 (1st Cir. 2010).  Federal common law, however,
points the Court to state law.  <u>See</u> <u>Taylor</u> v. <u>Sturgell</u>, 553 U.S.
880, 906 n.4 (2008) ("For judgments in diversity cases, federal
law incorporates the rules of preclusion applied by the State in
which the rendering court sits.") (citing <u>Semtek Int'l Inc.</u> v.
<u>Lockheed Martin Corp.</u>, 531 U.S. 497, 508 (2001)).  That the
Court is sitting in diversity jurisdiction is irrelevant:
federal common law still determines the issue-preclusive effect
of a prior federal judgment.  <u>See</u> <u>Johnson</u> v. <u>SCA Disposal Servs.
of New England, Inc.</u>, 931 F.2d 970, 974 (1st Cir. 1991) ("[I]n
diversity cases, federal law governs the preclusive effect of
prior federal judgments.").

individual claims, and, with respect to "all others similarly situated," is relevant only insofar as the jury's verdict showed that Lisandro was not a fit representative.[12]

As Reeves correctly points out, he was not a party to that prior action,[13] nor did Lisandro represent his interests, and thus, Reeves cannot be precluded from raising the same claims. See Massachusetts Prop. Ins. Underwriting Ass'n v. Norrington, 395 Mass. 751, 754 (1985) ("A nonparty to a prior adjudication can be bound by it only where the nonparty's interest was

_____

[12] The Court conducts such exemplar trials addressing only the named plaintiff's individual claims in order better to assess the evidence that will support the Court's decision to grant or deny class certification. If, at the exemplar trial, the jury returns a verdict in favor of the named plaintiff, without entering a final judgment, the Court proceeds to decide whether to certify a class represented by the named plaintiff. If, instead, the jury returns a verdict for the defendant in the exemplar trial, as was the case with Lisandro, the Court concludes that the named plaintiff is not an adequate class representative, denies the named plaintiff's motion for class certification and enters judgment against him. Contrary to the Reeves Defendants' arguments, however, this denial does not close the door to certifying a class with a different named plaintiff, such as Reeves.

[13] Since, after the completion of the exemplar trial, the Court denied Lisandro's class certification motion, "a properly conducted class action [never] existed at any time in the [Lisandro] litigation." Smith v. Bayer Corp., 564 U.S. 299, 315 (2011). As an unnamed class member in Lisandro's putative class action, Reeves does not qualify as party to that class action "before the class is certified." Id. at 313 (citing Devlin v. Scardelletti, 536 U.S. 1, 16 n.1 (2002) (Scalia, J., dissenting)); see also id. at 315. It follows that Lisandro's putative class action litigation does not issue-preclude Reeves' instant action because "[n]either a proposed class action nor a rejected class action may bind nonparties." Id.

represented by a party to the prior litigation. . . . It creates
no privity between two parties that, as litigants in two
different suits, they happen to be interested in proving or
disproving the same facts.") (internal citations and quotation
marks omitted).

### B.   Class Certification

What issue next deserves analysis?  In the normal course,
the Court would turn to the second of the Reeves Defendants'
arguments advanced in their motion to dismiss: that Reeves is
subject to a binding arbitration agreement that prevents him
from filing a class action complaint.  <u>See</u> Defs.' Mem. Dismiss
4-9, <u>Reeves</u>.  In contrast to the more-involved factual inquiry
into whether the purported classes pass muster under Federal
Rule of Civil Procedure 23, described <u>infra</u> Part II-B, whether
an arbitration agreement is binding is a straightforward legal
issue.  Nevertheless, the Court here, in the unique
circumstances of this case -- where, because of the <u>Lisandro</u>
exemplar trial, the Court is already familiar with the
underlying factual circumstances relevant to its Rule 23
analysis -- first explains why it certified the two classes,
before delving into the validity of the Reeves Defendants'
arbitration agreement.

### 1.   Class Actions under Rule 23

Rule 23 of the Federal Rules of Civil Procedure provides the framework under which this Court resolves issues of class certification. Rule 23(a) sets the initial bar, requiring that:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Where a plaintiff also relies on Rule 23(b)(3) to request class certification, as is the case here, see Mot. Certify Class 3, Tigges; Mot. Certify Class 3, Reeves, a district court must also find that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. (23)(b)(3).

Several guideposts inform the Court on what it can and cannot do when determining whether to certify a class. First, "district courts have broad discretion to grant or deny class certification." McCuin v. Sec'y of Health and Human Servs., 817 F.2d 161, 167 (1st Cir. 1987). Nevertheless, "[a] district court must conduct a rigorous analysis of the prerequisites established by Rule 23 before certifying a class." Smilow v. Sw. Bell Mobile Sys., Inc., 323 F.3d 32, 38 (1st Cir. 2003). This analysis requires an evaluation by the Court of the

[16]

evidence presented by the Plaintiffs, who bear the burden of proof, e.g., Amgen Inc. v. Connecticut Ret. Plans & Trust Funds, 133 S. Ct. 1184, 1209 (2013); Overka v. Am. Airlines, Inc., 265 F.R.D. 14, 17 (D. Mass. 2010), but the inquiry ought not become a full-blown trial on the merits, In re New Motor Vehicles Canadian Exp. Antitrust Litig., 522 F.3d 6, 17 (1st Cir. 2008) (internal citation omitted).  Since, however, the Court "must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues," Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 295 (1st Cir. 2000) (quoting Castano v. American Tobacco Co., 84 F.3d 734, 744 (5th Cir. 1996)), it is "entitled to look beyond the pleadings," In re PolyMedica Corp. Sec. Litig., 432 F.3d 1, 6 (1st Cir. 2005), and "some inquiry into the merits" is appropriate to evaluate compliance with the Rule 23 requirements.  In re New Motor Vehicles, 522 F.3d at 24 (internal citations omitted).

Of the Rule 23(a) requirements, here the Defendants dispute only whether the proposed classes meet the Rule 23(a)(2) commonality and the Rule 23(a)(3) typicality requirements.  See Opp'n Mot. Certify Class 1, Tigges; Opp'n Mot. Certify Class 1 Reeves.  They also argue that the proposed classes fail the Rule 23(b)(3) requirements and that certification would flout Article III's standing requirements.  Opp'n Mot. Certify Class 1, 19,

[17]

Tigges; Opp'n Mot. Certify Class 1, 19, Reeves.  After
discussing the substantive law on which the Plaintiffs base
their claims, the Court analyzes each disputed Rule 23
requirement (along with the related Article III argument), and
explains how the Plaintiffs met their burden and are entitled to
the Court's certification of the two classes.

### 2.   Underlying Substantive Law

The claims giving rise to the class certification efforts
are brought under Massachusetts's Tips Act and its Minimum Wage
Act.

Specifically, according to the Plaintiffs, the "delivery
charge" billed to customers is in fact a "service charge," Class
Action Compl. 1, Tigges; Class Action Compl. 1, Reeves.  Section
152A of the Tips Act defines a "service charge" as "a fee that a
patron or consumer would reasonably expect to be given to a . .
. service employee."  Mass. Gen. Laws ch. 149, § 152A(a).  The
statute provides a safe harbor provision if an employer
"provide[s] a designation or written description of that . . .
fee, which informs the patron that the fee does not represent a
tip or service charge for wait staff employees, service
employees, or service bartenders."  Id. § 152A(d).  The relevant
inquiry under this provision of the statute asks whether "a
reasonable customer would understand that the employer did not

distribute the fee amongst employees." <u>Carpaneda</u>, 991 F.Supp.2d at 274 (internal citation omitted).

The Plaintiffs' other claims concern the Minimum Wage Act's prohibition against employers paying employees less than the "minimum wage" unless the state commissioner[14] "expressly" approves the payment of such wages in conformity with Sections 7 and 9 of the Minimum Wage Act.  Mass. Gen. Laws ch. 151, § 1. The related regulations issued by the Massachusetts Division of Occupational Safety establish that an employer may not pay a "tipped minimum wage," lower than the "basic minimum wage," unless the following requirements are met:

1. the employer informs such employee in writing of the provisions of M.G.L. c. 151, § 7, paragraph three;

2. the employee actually receives tips in an amount which, when added to the service rate, equals or exceeds the basic minimum wage; and

3. all tips received by the employee are either retained by him or her or are distributed to him or her through a tip-pooling arrangement. If the employee is engaged in the serving of food or beverages, a tip-pooling arrangement must conform with the requirements of M.G.L. c. 149, § 152A. Unless all three of the foregoing requirements are met, the employer must pay a tipped employee at least the full basic minimum wage.

454 Code Mass. Regs. 27.03(2).  Here, the Plaintiffs allege that the Defendants were required to pay them the "[basic] minimum

---

[14] The state commissioner is the Director of the Department of Labor Standards.  Mass Gen. Laws ch. 151, § 2.

wage" because they did not satisfy conditions 1 and 2.  Mot.
Certify Class 2, Tigges; Mot. Certify Class 2, Reeves.  This
second claim boils down to whether the Plaintiffs properly were
notified of the provisions of Mass. Gen. Laws ch. 151, § 7 and
whether the delivery charge was a "service charge" within the
meaning of the Tips Act.

### 3.   Commonality – Rule 23(a)(2)

Commonality is a class certification requirement focused
not so much on the existence of contentions of "law or fact,"
Fed. R. Civ. P. 23(a)(2), common to the class, but on whether
"the determination of [these contentions'] truth or falsity will
resolve an issue that is central to the validity of each one of
the claims in one stroke."  Wal-Mart Stores, Inc. v. Dukes, 564
U.S. 338, 350 (2011).  The analysis does not depend on the
number of common questions; one significant question will do.
Id. at 359 ("[F]or purposes of Rule 23(a)(2) even a single
common question will do[.]") (internal citation and alterations
removed).  In general, where "implementation of [a] common
scheme is alleged, the commonality requirement usually is
satisfied."  Overka, 265 F.R.D. at 18 (internal citation
omitted).

The Plaintiffs allege such common schemes in both of the
instant cases, arguing that common answers to the following
common questions drive the litigation: whether the Defendants

violated Massachusetts law by paying the delivery drivers a
tipped minimum wage without notification, whether the delivery
charge is in fact a "service charge" within the meaning of the
Tips Act, whether the Defendants can rely on the safe harbor
provision of the Tips Act, whether the gas mileage reimbursement
paid to drivers was paid from the delivery charge, and how
damages ought be calculated.  Mot. Certify Class 9, <u>Tigges</u>;
Mot. Certify Class 9, <u>Reeves</u>.  The Defendants do not contest
commonality for the notification claim; they argue that the
Plaintiffs cannot meet their burden with respect to the "service
charge" claims because individual circumstances are central to
answering any common questions.  In other words, the Defendants
argue that the following factors all vary from driver to driver,
and, even as to the same driver, can vary with each transaction:
the manner in which the order was placed; whether a customer
asks the delivery driver about the delivery charge; whether the
delivery driver offers this information herself; the
demographics of the area where the pizza is delivered; whether
customers are repeat customers; whether the customer paid by
credit card; and whether the receipt includes a line for a tip.
Opp'n Mot. Certify Class 9-14, <u>Tigges</u>; Opp'n Mot. Certify Class
9-14, <u>Reeves</u>.

The Plaintiffs, however, have the better argument in these
cases.  There is one common question central to all the

Plaintiffs' claims -- whether the Defendants have violated
Massachusetts law by not distributing the "delivery charge" to
the delivery drivers.  That an answer to this question may vary
because of the difference in legal disclaimers when customers
order by phone, online, or mobile app does not transform the
analysis into an individual inquiry -- separate sub-questions on
the jury verdict slip may provide specific separate answers for
each method of ordering, if necessary.  Changes in the legal
disclosure policies that were implemented at different times in
the different stores, see, e.g., Aff. Henry Askew Supp. Opp.
Class Certification ¶¶ 7-11, Tigges, ECF No. 28-1; Aff. Henry
Askew Supp. Opp. Class Certification ¶¶ 7-11, Reeves, ECF No.
16-1, could be addressed similarly, with the question of when
the change was implemented becoming relevant only at the damages
stage.

The Court parts company with Luiken v. Domino's Pizza, LLC,
705 F.3d 370 (8th Cir. 2013), the Eight Circuit decision on
which the Defendants place great significance.  See Opp'n Mot.
Certify Class 9-11, Tigges; Opp'n Mot. Certify Class Reeves, 9-
11.  Under a fact pattern like the one here, the Eight Circuit
reversed certification of a class of pizza delivery drivers,
concluding that the class failed commonality because "varying
circumstances" guided a reasonable customer's expectations about
whether a "delivery charge" qualified as a gratuity under a

similar Minnesota statute.  Luiken, 705 F.3d at 375-76.  These
circumstances included whether the driver explained or the
customer asked about the delivery charge or whether the charge
was within the normal range for a tip in the respective delivery
area.  See id. at 372, 374.  The Luiken court's interpretation
of the Minnesota statute could bring in all sorts of extraneous
information, such as a customer's magnanimity, social status, or
propensity towards asking about the meaning of the "delivery
charge" would transform the analysis into an individualized
inquiry.  Cf. id.  The Luiken court's reasonableness inquiry
does not, however, convince this Court that it should adopt a
similar analysis in Massachusetts.

The standard in question under the Massachusetts Tips Act
is an objective one, that of a customer's reasonable
expectations.  Mass. Gen. Laws ch. 149, § 152A.  Although the
Supreme Judicial Court has not yet offered guidance on the
specific confines of the reasonableness inquiry, the Tips Act
imposes a "type of 'strict liability' to achieve its goal."
Matamoros v. Starbucks Corp., 699 F.3d 129, 137 (1st Cir. 2012)
(citing Cooney v. Compass Grp. Foodserv., 69 Mass. App. Ct. 632,
673-74 (2007)).  The focus is on the employer's policies, as
evidenced by the advisory letter issued by the Attorney General
of Massachusetts, see Att'y General's Fair Labor Division,
Advisory 2004/3, An Advisory from the Attorney General's Fair

Labor and Business Practices Division on an Act Protecting the
Wages and Tips of Certain Employees ("Advisory 2004/3"),
available at http://www.mass.gov/ago/docs/workplace/tips-
advisory.pdf (stating that, under the Tips Act, "ambiguously
described fees such as a service fee or service surcharge are
treated as service charges that must be remitted entirely to . .
. service employees"),[15] and not on whether a driver may
encounter a variety of customers throughout his employment --
for example, customers with various socio-economic backgrounds
or tipping proclivities.  Thus, contrary to Luiken's conclusion,
whether prosecuted individually or on a class-wide basis, save
for small variations, a trial on liability would unfold
identically, supporting a finding of commonality.  Cf., e.g.,
Spicer v. Pier Sixty LLC, 269 F.R.D. 321, 338 (S.D.N.Y. 2010)
("Viewed in the abstract, each event would have to be
scrutinized individually to determine what a reasonable patron
would have believed about the service charge from the totality
of the circumstances.  But the facts of this case indicate that
a much more generalized inquiry will be possible.").

---

[15] The Attorney General's perspective on these issues is of
considerable significance.  The Attorney General is "charged
with administering the Tips Act," and under Massachusetts law
receives "substantial deference" in her interpretation of the
Tips Act, meaning it controls so long as it is reasonable.
Bednark v. Catania Hosp. Grp., Inc., 78 Mass. App. Ct. 806, 815
n.20 (2011).

Were the reasonableness inquiry to implicate a foray into each customer's "'frailties or idiosyncrasies,'" id. (quoting Yarborough v. Alvarado, 541 U.S. 652, 662 (2004)), as the Defendants advocate, the Tips Act's justiciability would be frustrated even in the case of an individual plaintiff that brought a claim subsuming multiple instances when the employer collected a "service charge" without distributing it to the plaintiff.  The validity of such a claim would depend on a multitude of unascertainable factors such as whether a past customer tips or not, asks certain questions, has a certain socio-economic status, or is a repeat customer; all assessments that are independent of the employer's "service charge" policies.  In balancing between specificity and objectivity, the needle would tilt towards individual inquiries that impede fulfilment of the Tips Act's intent "that service employees receive the tips, gratuities, and service charges that customers intend them to receive."  DiFiore v. Am. Airlines, Inc., 454 Mass. 486, 491 (2009).  Given this conclusion, the objective inquiry in the instant cases -- the determination of the Defendants' liability under Massachusetts law -- is not derailed by overly individualized inquiries and is capable of a common answer.  The Court is satisfied that the putative classes comply with Rule 23(a)(2)'s commonality requirement.

### 4.    Typicality — Rule 23(a)(3)

Rule 23(a)(3) requires that plaintiffs prove that the named plaintiff's claims are typical of the class claims.  Fed. R. Civ. P. 23(a)(3).  This, however, does not require that the named plaintiff's claims be identical to those of other class members.  In re Credit Suisse-AOL Sec. Litig., 253 F.R.D. 17, 23 (D. Mass. 2008) (Gertner, J.) (citing Swack v. Credit Suisse First Boston, 230 F.R.D. 250, 259 (D. Mass. 2005) (Woodlock, J.)).  It suffices that the claims "arise from the same event or practice or course of conduct that gives rise to the claims of other class members, and are based on the same legal theory." Garcia-Rubiera v. Calderon, 570 F.3d 443, 460 (1st Cir. 2009) (internal alterations, quotation marks, and citation omitted).

In fact, a putative class usually fulfills the requirements of Rule 23(a)(3) "irrespective of the varying fact patterns underlying the individual claims."  In re Nat'l Football League Players Concussion Injury Litig., 821 F.3d 410, 428 (3d Cir.), as amended (May 2, 2016) (internal citation omitted).  This flexibility satisfies the typicality requirement's functional purpose of insuring that the named plaintiffs' interests are aligned and not in conflict with the claims of the absent class members.  See, e.g., In re Volkswagen & Audi Warranty Extension Litig., 273 F.R.D. 349, 352 (D. Mass. 2011) (Tauro, J.) (citing Baby Neal for & by Kanter v. Casey, 43 F.3d 48, 57 (3d Cir. 1994)), rev'd on other grounds, 692 F.3d 4 (1st Cir. 2012).

In the instant cases, the named Plaintiffs, Tigges and
Reeves, and the unnamed Plaintiffs are all former or present
pizza delivery drivers for one of the Defendants, seeking
compensation for unpaid service charges arising from their
employers' practice of charging their customers a delivery
charge.  Despite this, the Defendants argue that some of the
defenses expected at trial are peculiar to the named plaintiffs
or to a certain subset of plaintiffs, potentially destroying the
required typicality.  Opp'n Mot. Certify Class 15, Tigges; Opp'n
Mot. Certify Class 15, Reeves.

The Defendants' first example of such a defense, that some
of the Plaintiffs signed the Arbitration Agreement, will be
dealt with below.  See infra Part II-C.  The Tigges Defendants
also posit that Tigges is an atypical potential class
representative because (1) the Tigges Defendants instituted
additional customer disclosures about the delivery charge not
being a tip, such as a message on the call-catcher to all
incoming calls, in August or September 2013, after Tigges ended
his employment with the Tigges Defendants and, (2) a large chunk
of the temporal scope of Tigges's claims -- the period during
which he was employed by the Tigges Defendants -- seemingly
falls outside of the claims' statute of limitations, which is
August 12, 2012.  See Opp'n Mot. Certify Class 15-16, Tigges.
These potential defenses, however, threaten typicality only if

they stand to "become the focus of the litigation." In re
Credit Suisse-AOL Sec. Litig., 253 F.R.D. at 23.  That the
Tigges Defendants instituted a different type of disclosure
beginning at some point in 2013 does not rise to this level.
Instead, it is just one of the defenses that could be raised at
trial, and is not singularly dispositive of the Plaintiffs'
claims since the Tigges Defendants would still need to address
their other disclosures' compliance with the statutory
requirements prior to August 2013 and after August 12, 2012.

Nor is Tigges required to have been employed for all or
most of the time relevant to the class claims in order to
support typicality.  In essence, the Tigges Defendants cannot
articulate why Tigges's being employed by them for a slightly
different time period than other class members, without more,
would create a conflict of interests or skew Tigges's incentives
away from those whom he represents.  Again, the other class
members challenge the same policies and practices.  For these
reasons, the Court ruled that the proposed classes it has
certified meet the Rule 23(a)(3) requirements.

### 5. Rule 23(b)(3) Requirements

The Plaintiffs seek class certification under Rule
23(b)(3), which requires the Court find that "the questions of
law or fact common to class members predominate over any
questions affecting only individual members, and that a class

action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In practice, predominance requires only that individual questions not "overwhelm common ones." In re Nexium Antitrust Litig., 777 F.3d 9, 21 (1st Cir. 2015) (citation omitted).

Satisfaction of this prong follows quickly from the preceding commonality analysis. As discussed supra Part II-B-2, the liability determination centers on the common issue of the Defendants' payment of a "tipped minimum wage" in the absence of written notice and their policy of failing to treat delivery charges as "service charges." Any other individual issue of damages, as a function, for example, of the introduction of the call-catcher by the Reeves Defendants, can, as the Plaintiffs point out, Mot. Certify Class 14, Tigges; Mot. Certify Class 14, Reeves, be solved by reference to Domino's centralized PULSE database, and thus this potential variation in damages does not flunk the predominance requirement.[16] See Smilow, 323 F.3d at 40 ("Common issues predominate where individual factual determinations can be accomplished using computer records, clerical assistance, and objective criteria -- thus rendering

---

[16] The Plaintiffs' class counsel agrees that, should there be a finding of liability, individual damages can be calculated directly from this extensive PULSE database. See Tr. Status Conference 13:20-14:12, Tigges.

[29]

unnecessary an evidentiary hearing on each claim."). Questions
of injury-in-fact that require individual answers, such as
whether the delivery drivers that informed customers that the
delivery charge was not a tip suffered injury, similarly need
not undermine class certification, see In re Nexium Antitrust
Litig., 777 F.3d at 21 ("Where common questions predominate
regarding liability, . . . courts generally find the
predominance requirement to be satisfied even if individual
damages issues remain.") (internal alterations and citations
omitted).[17]

As for the second prong -- that a class action is superior
to other available methods for fairly and efficiently
adjudicating the controversy[,]" Fed. R. Civ. P. 23(b)(3) -- the
instant cases are precisely the types of claims animating the
creation of the federal class action as a mechanism "to overcome
the problem that small recoveries do not provide the incentive
for any individual to bring a solo action prosecuting his or her

_____

[17] This is particularly so when these individualized issues
are unlikely to overwhelm the common issues, which appears to be
the case here, given the debatable evidence of the existence of
such practice among drivers, Compare Aff. Henry Askew Supp. Opp.
Class Certification ¶ 9, Tigges, and Aff. Henry Askew Supp. Opp.
Class Certification ¶ 9, Reeves (stating that more seasoned
delivery drivers inform customers that the delivery charge is
not a tip), with Opp'n Mot. Certify Class, Ex. 3, Investigative
Memorandum, Reeves, ECF No. 16-3 (reporting that, in ten orders
from the Reeves Defendants, none of the delivery drivers
explained that the delivery charge was not a tip, despite not
receiving a tip from the investigator).

rights." Amchem Products, Inc. v. Windsor, 521 U.S. 591, 617
(1997) (internal citations and quotation marks omitted).  The
aggregation of the many delivery drivers' small individual
claims, where each delivery charge claimed is only a couple of
dollars, is superior to individual adjudication because "there
is a real question whether the putative class members could
sensibly litigate on their own for these amounts of damages[.]"
Gintis v. Bouchard Transp. Co., 596 F.3d 64, 68 (1st Cir. 2010).
But cf. American Express Co. v. Italian Colors Rest., 133 S. Ct.
2304, 2309 (2013) (asserting that Rule 23 does not "establish an
entitlement to class proceedings for the vindication of
statutory rights").

Contrary to the Defendants' arguments, such a class action
is not unmanageable -- as discussed in the commonality section,
the inquiry does not involve the dissection of each delivery
driver-customer interaction; the actual adjudication would not
dwarf in complexity an exemplar trial such as Lisandro's.  In
fact, the Court's experience with the Lisandro trial and the
type of evidence, defenses, and witnesses employed by the
parties has markedly informed this Court's understanding of the
business realities of this marketplace and its Rule 23 analysis.

### 6.  Article III Standing

At the class certification stage, questions of standing are
sometimes addressed by courts as part of the Rule 23(b)(3)

analysis.  See, e.g., In re Nexium Antitrust Litig., 777 F.3d at
31-32 (discussing "the separate but related argument that
because each putative class member has not suffered injury, the
class does not have standing"); In re Light Cigarettes Mktg.
Sales Practices Litig., 271 F.R.D. 402, 418 (D. Me. 2010).
Here, the Defendants claim that, apart from Rule 23's
requirements, the Plaintiffs' classes cannot proceed because
doing so would violate Article III, the Rules Enabling Act, and
Due Process.  See Opp'n Mot. Certify Class 19-20, Tigges; Opp'n
Mot. Certify Class 19-20, Reeves.  The Court chooses to analyze
these arguments as one since they implicate the same Article III
question.

    The existence of an Article III case and controversy
requires "an injury to the plaintiff traceable to the
defendant."  Plumbers' Union Local No. 12 Pension Fund v. Nomura
Asset Acceptance Corp., 632 F.3d 762, 768 (1st Cir. 2011)
(internal citation omitted).  Although the Court's jurisdiction
is limited by Article III requirements, at the class
certification stage it need only "be satisfied that, prior to
judgment, it will be possible to establish a mechanism for
distinguishing the injured from the uninjured class members."
In re Nexium Antitrust Litig., 777 F.3d at 19 (emphasis
supplied).

Here, the Defendants argue that injury cannot be shown for the delivery drivers who, for example, worked at a franchisee that had a call-catcher advise customers that the delivery charge was not a tip, or for those who themselves advised customers about the delivery charge, or whose customers were familiar with the delivery charge, and that there is no way of finding out whether each class member suffered any direct injury without an individualized process.  Opp'n Mot. Certify Class 19-20, Tigges; Opp'n Mot. Certify Class 19-20, Reeves.  The impact of the call-catcher policy can be addressed through special questions to the jury.  See supra Part II-B-2.  Moreover, the Court has already successfully conducted an individual trial, Lisandro's, premising the liability theory on the expectations of the "reasonable average customer," without requiring a separate analysis of the interactions between Lisandro and each of his customers.  See Trial Tr. 79-83, Oct. 23, 2015, Lisandro, ECF No. 97 (stating jury charge).  It follows that no such analysis ought be required in the class action to establish "injury."  See In re Nexium Antitrust Litig., 777 F.3d at 20 ("There cannot be a more stringent burden of proof in class actions than in individual actions."); see also DiFiore v. Am. Airlines, Inc., 688 F. Supp. 2d 15, 26 (D. Mass. 2009) (calculating damages under Tips Act for skycaps based on American Airlines records, without resort to individualized

skycap-customer interactions), rev'd and remanded on other grounds, 646 F.3d 81 (1st Cir. 2011).

### C.    The Effect of the Arbitration Agreement

Having ruled that both these cases ought proceed as class actions, the Court necessarily must face the Reeves Defendants' contention that, due to the arbitration agreement between the parties, Reeves's case ought not proceed at all.  See Defs.' Mem. Dismiss 4-9, Reeves.  About the time Askew -- who owns the franchisees with which he is a co-defendant in each of the instant actions, see Class Action Compl., Tigges; Class Action Compl., Reeves, and who owned the Prior Defendants -- bought off Prinholato, see supra Part I-B (describing Prinholato accepting November 6, 2014 offer of judgment), he began to roll out a thoughtfully crafted arbitration agreement for his employees to sign.[18]  See Aff. Henry Askew Supp. Opp. Class Certification ¶ 10, Reeves (starting in October 2013 the Reeves Defendants "began presenting [their] employees with arbitration agreements").

---

[18] Askew, a former pizza delivery driver himself, Trial Tr. 55:12-14, Oct. 21, 2015, Lisandro, ECF No. 96, is sued individually in both of the current cases.  Because it is undisputed that he controls both of the franchisee-defendants here, the Court will, where context permits, refer to him personally as the one orchestrating the defensive moves.

Reeves signed this agreement.  See Arb. Agreement 4 (containing Reeves's signature).  The arbitration agreement is not unconscionable and Reeves's signature was obtained without unlawful duress.  Because it has a simple opt-out clause, see id. at 4, it is not even what is known as a "forced" or "mandatory" arbitration agreement, in which the signee lacks choice in the matter, see Jean R. Sternlight, Creeping Mandatory Arbitration: Is It Just?, 57 Stan. L. Rev. 1631, 1632 n.1 (2005) (discussing the various labels used when discussing arbitration; choosing "mandatory" for consumer arbitration because "the practical reality [is] that consumers have little if any choice but to accept the arbitration provision mandated by the company.").[19]

Generally, there is nothing, legally speaking, wrong with arbitration agreements, even mandatory ones.[20]  See, e.g., David

---

[19] Common sense supports categorizing an arbitration agreement with an opt-out provision differently than one without.  Behavioral economics, however, has demonstrated the power of default rules: in short, people are reluctant to opt-out.  See, e.g., Eric J. Johnston & Daniel Goldstein, Do Defaults Save Lives?, 302 Science 1338 (Nov. 21, 2003) (showing that organ donation rates are twice as high when organ donation is the default, and people must opt-out, as compared with needing to opt-in to donate).

[20] Alone among Western industrialized nations, see infra note 29, the United States empowers businesses to employ arbitration agreement to bar their customers from access to court.  A majority of the Supreme Court professes to believe Congress intended this result by enacting the Federal Arbitration Act ("FAA"), see AT&T Mobility LLC v. Concepcion,

S. Schwartz, <u>Mandatory Arbitration and Fairness</u>, 84 Notre Dame L. Rev. 1247, 1249 (2009) (collecting cases).  This one, however, contains a class-action waiver provision and, as will be seen, that proves to be its Achilles' heel.

To bar litigation and compel arbitration, the moving party must show that "a valid agreement to arbitrate exists, that the movant is entitled to invoke the arbitration clause, that the other party is bound by that clause, and that the claim asserted comes within the clause's scope."  <u>Dialysis Access Ctr., LLC</u> v. <u>RMS Lifeline, Inc.</u>, 638 F.3d 367, 375 (1st Cir. 2011) (internal citation omitted).  The question of arbitrability is a legal one, involving the parties' intent: did they intend to arbitrate matters like the one at issue?  <u>See id.</u> (internal citation omitted).[21]  The Court assumes they did, as the agreement's language is sweeping, <u>see</u> Arb. Agreement 1 (submitting "all claims, rights, suits in tort or contract of or relating to [an] [e]mployee's employment by [the] [c]ompany and/or the separation

---

563 U.S. 333, 344-46 (2011), and, thus far, Congress is not disposed to disagree, <u>but see</u> <u>id.</u> at 362 (Breyer, J., dissenting) (arguing that Congress's original intent is being misinterpreted by the majority).

[21] This is a question the Court itself can answer unless the parties "clearly and unmistakably provide" that an arbitrator must interpret the scope of the agreement.  <u>Dialysis Access Ctr., LLC</u>, 638 F.3d at 375 (internal citations omitted).

from that employment"), and Reeves does not advance a
contractual interpretation to the contrary.

Reeves still maintains, however, that the Court cannot
compel arbitration.  His argument does not sound in contract,
but in federal labor law: he claims that the National Labor
Relations Act (again, the "NLRA") confers on employees such as
him a substantive right to act collectively, and that the
arbitration agreement unlawfully abridges that right.  See
Pl.'s Opp. Defs.' Mot Dismiss Compel Arbitration 14-15 ("Pl.'s
Mem. Opp. Def.'s Mot Compel"), Reeves, ECF No. 14.  The Reeves
Defendants, meanwhile, claim that the Federal Arbitration Act
(again, the "FAA"), another federal statute, in fact mandates
enforcement of the agreement here.  See Defs.' Mem. Dismiss 5-6,
Reeves.  The Court ruled in favor of Reeves on this issue, see
Elec. Clerk's Notes, Reeves, ECF No. 22.  The Court did so, in
short, because the NLRA precludes enforcement, in these
circumstances, of a class-action waiver, even one with an opt-
out clause, and the FAA is not to the contrary.

More specifically, the parties' arguments raise three
issues with respect to this arbitration agreement, which will be
addressed in turn.  First, the Court will address whether the
right bestowed upon employees by the NLRA -- the right "to
engage in other concerted activities for the purpose of . . .
mutual aid or protection," 29 U.S.C. § 157 -- is substantive, as

urged by Reeves, Pl.'s Mem. Opp. Def.'s Mot Compel 14, <u>Reeves</u>,

or merely procedural.   Second, the Court will address whether

the substantive right conferred by the NLRA conflicts with the

FAA, and if so, which federal right should prevail.   Finally,

the Court raises the possibility that this arbitration

agreement's opt-out provision, <u>see</u> Arb. Agreement 4, saves it

from invalidation under the NLRA; in other words, the Court

considers the question: even if the NLRA confers upon him this

right, can't Reeves knowingly waive it?   Ultimately, the Court

rules that he cannot, reaching the same conclusion as the

National Labor Relations Board (the "NLRB").

> **1.   The Right to Engage in Concerted Action for
>     Mutual Aid or Protection is a Substantive Right
>     that Includes Filing a Class Action Lawsuit.**

Reeves argues that the NLRA provides employees, such as

him, the right "to engage in concerted action for their mutual

aid or protection."   Pl.'s Mem. Opp. Def.'s Mot Compel 14,

<u>Reeves</u> (citing 29 U.S.C. § 102).   Employees filing a lawsuit

together exemplifies protected "concerted action," as the First

Circuit recognized more than forty years ago.   See <u>Leviton Mfg.

Co</u>. v. <u>NLRB</u>, 486 F.2d 686, 689 (1st Cir. 1973) ("[T]he filing of

a labor related civil action by a group of employees is

ordinarily a concerted activity protected by § 7, unless the

employees acted in bad faith.") (internal citations omitted).

Ruling from the bench on May 23, 2016, this Court explained that

[38]

the class action waiver at issue here impermissibly infringed upon this right, since "the very essence of labor right[s] under the . . . National Labor Relations Act is collective action." Status Conference Tr. 4:16-18, Reeves, ECF No. 23.

Days later, the Seventh Circuit, in a major decision written by Chief Judge Diane Wood, issued an opinion similarly refusing to enforce an arbitration agreement that would have precluded employees protected by the NLRA from bringing a class action lawsuit. See Lewis v. Epic Sys. Corp., No. 15-2997, 2016 WL 3029464, at *10 (7th Cir. May 26, 2016). The opinion brought the Seventh Circuit into conflict with the Fifth, Eighth, and Second Circuits. Compare id., with In re D.R. Horton, Inc., 737 F.3d, 357 (5th Cir. 2013) (holding that "[t]he use of class action procedures . . . is not a substantive right[]" and rejecting the NLRB's rule) (internal citation omitted), Owen v. Bristol Care, Inc., 702 F.3d 1050, 1055 (8th Cir. 2013) (same), and Sutherland v. Ernst & Young LLP, 726 F.3d 290, 297 n.8 (2d Cir. 2013) (same).[22] The Fifth Circuit's opinion is the most

---

[22] The Court notes, however, that at least two other district courts' rulings are consistent with its interpretation of the NLRA and FAA. See Totten v. Kellogg Brown & Root, LLC, No. EDCV141766DMGDTBX, 2016 WL 316019, at *13 (C.D. Cal. Jan. 22, 2016) (Gee, J.) (holding that the right to act collectively is a substantive right and therefore, cannot be waived; endorsing the NLRB's interpretation); Lewis v. Epic Systems Corp., W.D. Wis., No. 15-CV-82-BBC (Sept. 11, 2015) (Crabb, J.) (providing the opinion affirmed by the Seventh Circuit's opinion).

comprehensive of the three going the other way, and offers a
useful starting point for the analysis.  It ruled that "[t]he
use of class action procedures . . . is not a substantive
right[,]" but rather is merely a procedural method for
vindicating rights that have their source elsewhere.  D.R.
Horton, Inc., 737 F.3d at 357-58.  The Court disagrees with this
legal conclusion, for largely the reasons articulated by Judge
Wood in Lewis.

The Lewis court held that "the right to collective action"
is a substantive right, because the right "lies at the heart of
the restructuring of employer/employee relationships that
Congress meant to achieve in the [NLRA][,]"  Lewis v. Epic
Systems Corp., 2016 WL 3029464 at *9 (7th Cir. 2016) (Wood, J.)
(internal citations omitted).  The language of Section 7 itself
speaks of the "right" it confers on employees.  See 29 U.S.C. §
157 (stating "[e]mployees shall have the right to . . . engage
in other concerted activities for the purpose of . . . other
mutual aid or protection") (emphasis supplied).  Lewis also
pointed to the structure of the statute as support for its
ruling, noting that Section 8 of the NLRA declares it an "unfair
labor practice" for an employer to "interfere with, restrain, or
coerce employees in the exercise" the rights enumerated in
Section 7.  Id. at *1 (citing 29 U.S.C. § 158(a)(1)).  In other
words, Section 8 is the enforcement provision, and Section 7 is

the underlying substantive provision, not a mere procedural one.
See id. This is apparent from the statute itself, and were
there ambiguity, the Court would defer to the NLRB's
interpretation, which is a reasonable one.[23]

### 2. The FAA Does Not Conflict with the NLRA with respect to Class Action Waivers.

The Tigges Defendants argue that the FAA nevertheless
compels the enforcement of the arbitration agreement, including
the class action waiver. Reeves, Defs.' Mem. Dismiss 5-9. If
enforcing this agreement is required by the FAA, yet violates
the substantive rights conferred on employees by the NLRA, then
the Court would need to mediate a conflict between federal
statutes. The Court, however, rules that there is in fact no
conflict, because the FAA does not require enforcement of the
class action waiver here.

To be sure, the Reeves Defendant's argument commended
itself to the Fifth Circuit, which held that the NLRB's
interpretation of the NLRA (which is identical to the Court's)
conflicted with the FAA. D.R. Horton, 737 F.3d at 360

---

[23] The Seventh Circuit followed this path, as well. See
Lewis, 2016 WL 3029464 at *3 (citing D.R. Horton, Inc., 357
N.L.R.B. No. 184 (2012), enf'd in part and granted in part, D.R.
Horton, Inc. v. NLRB, 737 F.3d 344 (5th Cir. 2013)). For a
particularly persuasive explanation of the merits of the NLRB's
decision in D.R. Horton, see Charles A. Sullivan & Timothy P.
Glynn, Horton Hatches the Egg: Concerted Action Includes
Concerted Dispute Resolution, 64 Ala. L. Rev. 1013 (2013).

("Requiring a class mechanism is an actual impediment to arbitration and violates the FAA.").  This argument misinterprets the FAA, however.

The FAA does not place arbitration agreements on a "pedestal" on which all other legal rights are to be sacrificed, cf. Richard Frankel, The Arbitration Clause as Super Contract, 91 Wash. U. L. Rev. 531 (2014) (noting that courts often, but incorrectly, seem to "place[] arbitration clauses not on equal footing, but on a pedestal"); rather, the FAA merely ensures that arbitration agreements -- which, at the time of the FAA's enactment, were subject to "longstanding judicial hostility," E.E.O.C. v. Waffle House, Inc., 534 U.S. 279, 289 (2002) (internal citation omitted) -- are placed on an "equal footing" with contracts, id.; see Richard Frankel, supra, at 532.

That arbitration agreements ought be treated like contracts is apparent, or should be, from the text of the FAA itself: a "written provision in . . . a contract evidencing a transaction . . . to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2; see Lewis, 7th Cir., No. 15-2997 at *5 (stating arbitration agreements ought be "as enforceable as any other contracts, but not more so.") (citing Prima Paint Corp. v. Flood & Conklin Mfg.

Co., 388 U.S. 395, 404 (1967)).  While true that the FAA

expresses a "liberal federal policy favoring arbitration," e.g.,

Moses H. Cone Memorial Hospital v. Mercury Constr. Corp., 460

U.S. 1, at 24 (1983), the Supreme Court has consistently stated

the "fundamental principle that arbitration is a matter of

contract."  AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 339

(2011).

Since, as described supra Part II-C-1, enforcing an

arbitration agreement barring class actions would infringe on a

substantive federal right, the FAA provides nothing to the

contrary.  See Lewis, 2016 WL 3029464, at *6 (stating that since

"as a general matter, illegal promises [would] not be enforced

in cases controlled by . . . federal law," the FAA and the NLRA

are not in conflict).

### 3.    The Opt-Out Provision Does Not Save the Class Action Waiver.

The class-action waiver at issue in this case differs in

one ostensibly significant respect from that in Lewis: there,

the contract "gave employees no option to decline if they wanted

to keep their jobs."  Lewis, 2016 WL 3029464, at *1.  Here, the

contract has an explicit opt-out provision: employees have "the

right to opt out of the obligations set [out in the agreement]."

Arb. Agreement 4.[24]  While there is some non-binding caselaw to

the contrary,[25] the NLRB itself has ruled that arbitration

agreements with employees that contain opt-out agreements still

violate the NLRA.  See On Assignment Staffing Servs., Inc., 362

N.L.R.B. No. 189 (2015), rev'd per curiam, On Assignment

---

[24] To exercise this right the employee must "send a written
statement via electronic mail or first-class mail, within thirty
(30) calendar days of signing [the agreement] . . . The
email/letter must clearly state the [e]mployee's name, Company
employee identification number and a telephone number where the
Employee can be reached along with a statement that the
[e]mployee opts out of [the agreement]. Arb. Agreement 4.
Further, although the employees are promised they will not
endure "retaliation, retribution, or discipline" for opting out,
id. at 4, they are also reminded that the employment
relationship remains at-will, id.  If the employee does not take
these steps, he "will be required to arbitrate all the disputes
covered by [the agreement]." Id.  Again, the empirical evidence
of the reluctance of people to opt-out, see supra note 19,
suggests this right will rarely be exercised.

[25]  The Court of Appeals for the Ninth Circuit has held that
an arbitration agreement between an employer and an employee,
which included a class action waiver, may be enforceable if the
employee had the right to opt out of the arbitration agreement.
See Johnmohammadi v. Bloomingdale's, Inc., 755 F.3d 1072, 1077
(9th Cir. 2014) (holding that an arbitration agreement with an
opt-out clause did not violate the NLRA); Shepardson v. Adecco
USA, Inc., No. 15-CV-05102-EMC, 2016 WL 1322994, at *3 (N.D.
Cal. Apr. 5, 2016) ("[T]he NLRA does not apply here because
Plaintiff signed a voluntary arbitration agreement with the
opportunity to opt out, and thus elected to arbitrate her
employment-related disputes on an individual basis.").  The
Fifth Circuit recently summarily reversed the very NLRB decision
on which the Court relies, see On Assignment Staffing Servs.,
Inc. v. NLRB, No. 15-60642, 2016 WL 3685206 (5th Cir. June 6,
2016), but that result was mandated given the Fifth Circuit's
precedent discussed supra Part II-C-1, and as also explained
there, the Court is not persuaded by that precedent.

Staffing Servs., Inc. v. NLRB, No. 15-60642, 2016 WL 3685206
(5th Cir. June 6, 2016).

At issue is whether an employer who gives its employees an
employment contract that includes an arbitration clause with an
opt-out provision has violated the NLRA.  Is the NLRA ambiguous
with respect to this issue?  If the intent of Congress is clear,
"that intent must be given effect."  See, e.g., NLRB v. Hilliard
Dev. Corp., 187 F.3d 133, 140 (1st Cir. 1999) (applying Chevron
deference to NLRB's interpretation of the NLRA).  If "the [NLRA]
is ambiguous or silent with respect to a specific issue, [the
Court] will defer to the [NLRB's] interpretation so long as that
interpretation is a permissible one, that is, one which is
rational and consistent with the statute."  Id. (internal
citations omitted); see also, e.g., Lechmere, Inc. v. NLRB., 502
U.S. 527, 536 (1992) ("Like other administrative agencies, the
NLRB is entitled to judicial deference when it interprets an
ambiguous provision of a statute that it administers.")
(internal citations omitted); NLRB v. NSTAR Elec. Co., 798 F.3d
1, 9 (1st Cir. 2015) (applying Chevron deference and adopting
the NLRB's interpretation because the statutory term was
ambiguous and the NLRB's interpretation was reasonable).

The NLRA is not ambiguous with respect to this issue, and
even if it were, the NLRB's interpretation is eminently

reasonable.[26]  As explained <u>supra</u> Part II-C-1, the NLRA confers

upon employees such as Reeves the right "to engage in . . .

concerted activities for the purpose of . . . mutual aid or

protection."  29 U.S.C. § 157.  "[A] statutory right conferred

on a private party, but affecting the public interest, may not

be waived or released if such waiver or release contravenes the

statutory policy."  <u>Brooklyn Sav. Bank</u> v. <u>O'Neil</u>, 324 U.S. 697,

704 (1945) (internal citations omitted).[27]  The question, then,

---

[26] The NLRB explained that these agreements violate the NLRA
in two ways.  First, the "opt-out procedure creates a second
mandatory condition of employment, which requires employees to
affirmatively act, by submitting an opt-out form that satisfies
requirements imposed by the [employer], to retain their Section
7 right to pursue collective or class litigation.  This
requirement interferes with this Section 7 right by
significantly burdening its exercise."  <u>On Assignment Staffing
Servs., Inc.</u>, 362 N.L.R.B. No. 189, at *1 (2015).  Second, more
fundamentally, the opt-out procedure is "unlawful because it
requires employees to prospectively waive their Section 7 right
to engage in concerted activity."  <u>Id.</u>

[27] <u>Brooklyn Savings Bank</u>, despite its age, remains good
law.  In fact, the First Circuit recently had occasion to
interpret it, and, although that court ruled that waiver did not
undermine the statutory policy at issue there, its reasoning in
fact supports the Court's here.  <u>See</u> <u>In re DiVittorio</u>, 670 F.3d
273, 286-87 (1st Cir. 2012) (discussing <u>Brooklyn Savings Bank</u>,
324 U.S. at 704).  There, the First Circuit held that the
purpose of the Truth in Lending Act -- "ensuring informed
decisionmaking for unsophisticated consumers [of credit]," <u>id.</u>
at 287 -- was not frustrated by a waiver of its otherwise-
mandated disclosures, because of the plaintiff had "guidance of
counsel, the time for reflection, [in exchange for waiving
disclosures, received a] reduction in interest rate . . . and
[had the transaction] specific[ally] approv[ed] [by a bankruptcy
court,]" <u>id.</u> at 288.
   Unlike the plaintiff in <u>In re DiVittorio</u>, here Tigges is
the paradigmatic employee to whom the NLRA grants rights, and

is whether allowing employees to waive this right by entering
into binding arbitration agreements that preclude class action
complaints "contravenes" the policy behind the NLRA.  Id.  "[I]n
enacting § 7 of the NLRA, Congress sought generally to equalize
the bargaining power of the employee with that of his employer
by allowing employees to band together in confronting an
employer regarding the terms and conditions of their
employment."  NLRB v. City Disposal Sys. Inc., 465 U.S. 822, 835
(1984) (emphasis supplied).  What are the class actions before
the Court, if not employees "band[ing]" together, as a class, in
"confronting" their employer "regarding the terms . . . of their
employment?"  Id.;[28] cf. Lodge 743, Intern. Ass'n of Machinists,

_____

his class action lawsuit on behalf of other employees is exactly
the "concerted action" that the NLRA protects.

[28] Indeed, the Seventh Circuit recognized the parallel
between Section 7's language and the class-action procedure:

> "Collective, representative, and class legal remedies
> allow employees to band together and thereby equalize
> bargaining power." Phillips Petrol. Co. v. Shutts, 472
> U.S. 797, 809 (1985) (noting that the class action
> procedure allows plaintiffs who would otherwise "have no
> realistic day in court" to enforce their rights); Harry
> Kalven, Jr. & Maurice Rosenfield, The Contemporary
> Function of the Class Suit, 8 U. Chi. L. Rev. 684, 686
> (1941) (noting that class suits allow those
> "individually in a poor position to seek legal redress"
> to do so, and that "an effective and inclusive group
> remedy" is necessary to ensure proper enforcement of
> rights).

Lewis, 2016 WL 3029464, at *3.

AFL-CIO v. United Aircraft Corp., 337 F.2d 5, 9 (2d Cir. 1964)

("[T]he aim of [the NLRA] to give special protection to the

economically vulnerable would be defeated if contracts entered

into because of that very vulnerability were enough to preclude

enforcement of the [NLRA]."). NLRA's Section 7 rights are not

waivable by individual employees. And certainly, the NLRB's

interpretation of Section 7 -- that these agreements, even with

opt-out provisions, "burden[]" the exercise of Section 7 rights,

and unlawfully "require[] employees to prospectively waive their

Section 7 right to engage in concerted activity[,]" On

Assignment Staffing Servs., Inc., 362 N.L.R.B No. 189, at *1 --

is a reasonable one, in light of the statute's text and

purpose.[29]

---

[29] Favoring mandatory arbitration is a unique stance that
does not find approval in most states outside the United States.
The main concern for all these other states is that the
vulnerability of the "weaker party" to an agreement might be
used to bully them into waiving essential rights. The European
Union has regulated mandatory arbitration in consumer disputes
in Directive 93/13. Council Directive 93/13 of 5 April 1993 on
Unfair Terms in Consumer Contracts, 1993 O.J. (L 95) 29, WL OJ
1993 L95/29. The European Union's Directive mirrors the
concerns voiced by many critics of mandatory arbitration in the
United States, namely that "it is inherently unfair for a
company to require a consumer to resolve future disputes through
binding arbitration rather than in court." Jean R. Sternlight,
Is the U.S. Out on A Limb? Comparing the U.S. Approach to
Mandatory Consumer and Employment Arbitration to That of the
Rest of the World, 56 U. Miami L. Rev. 831, 846 (2002) (internal
footnote omitted). The European Union likely does not allow
"pre-dispute form agreements" requiring binding arbitration in
the employment context, id., and neither do most non-European-
Union states around the world, see id. at 852-53.

D.    **What Now?**

Having held that Reeves v. PMLRA Pizza is deserving of
class action treatment and that the class action waiver
provision in Reeves' arbitration agreement is invalid, I naively
thought that the case would nevertheless proceed before an
arbitrator on some sort of class action basis.

It was then I came to understand just how thoroughly Askew
has thought through these litigation issues, for the arbitration
agreement itself expressly provides: "should the waiver of
class, collective or representative action . . . be deemed
invalid . . . any such permitted class, collective or
representative action shall be subject to a court of competent
jurisdiction and not arbitration."  Arb. Agreement 3 (emphasis
supplied).

Nothing could more clearly express what's really going on
here.  Askew is not interested in the "effective vindication" of
his employees' statutory rights -- although, to be fair, the
Supreme Court has not been interested in protecting this either,
at least in the antitrust context, see Einer Elhauge, Essay, How
Italian Colors Guts Private Antitrust Enforcement by Replacing
It with Ineffective Forms of Arbitration, 38 Fordham Int'l L.J.
771, 772 (2015) (arguing that the Supreme Court has erroneously

allowed the enforcement of arbitration agreements even when
doing so undercuts the "effective vindication" of antitrust
law).  Instead, Askew's first goal is barring his employees from
the courthouse altogether.[30]  Failing that, he's not interested
in arbitration; he wants a genuine trial.  And well he should.
In this Session of the Court he will get a trial as rapidly as
he could get an arbitration hearing.[31]  Moreover, he will have
full discovery, appellate rights, and application of the rules
of evidence.  Evidence rules make a real difference here.
Absent the rule against hearsay, the Plaintiffs could broadly
testify to customer statements.[32]  This can hardly help Askew.

---

[30] After all, "the monetary value of many of these claims is
so small as to make individual prosecution economically
unfeasible."  Okezie Chukwumerije, The Evolution and Decline of
the Effective-Vindication Doctrine in U.S. Arbitration Law, 14
Pepp. Disp. Resol. L.J. 375, 376 (2014).

[31] This was to have been single person arbitration.  Arb.
Agreement ¶ 6.  As arbitration costs have generally been found
to at least rival those incurred by an average court, see
Christopher R. Drahozal, Arbitration Costs and Contingent Fee
Contracts, 59 Vand. L. Rev. 729, 736 (2006) ("[I]n many cases,
forum costs are likely higher in arbitration than in
litigation."), it seems a foregone conclusion that three-person
arbitration (meaning three arbitrators) is even more expensive
than litigation, as the arbitrators' salaries are a significant
cost, see id. at 737 (internal footnote omitted) (noting that
average arbitrators' "fees . . . [are] well over $1000 per day
(and up to $5000 per day for at least one commercial
arbitrator.").

[32] The rules of evidence regarding hearsay, despite being
easy to criticize due to, for one, their logical
inconsistencies, are apparently difficult to replace.  See

After all, he has already won one of these cases in court: Lisandro.

The Court has asked for the parties' views as to further proceedings.  They responded promptly.

The Plaintiffs' class counsel suggests that since the arbitration agreements' class action waiver provision is invalid, the Court ought expand the presently limited classes so that Tigges (no arbitration agreement) and Reeves (arbitration agreement) can represent all drivers and former drivers for their respective employers within the applicable statutes of limitation.  Joint Prelim. Resp. Court's Order Class Certif. 3, Reeves, ECF No. 25.  The Court demurs.  While confident of its reasoning, there is a circuit split as to an employers' ability to include class action waivers in employment contracts.  The First Circuit has not yet weighed in.  In such circumstances, it is the better part of valor to leave the delimited classes as they are.  No doubt these parties will explore settlement (they should).  In such negotiations, one who has not signed an arbitration agreement is in better shape than her fellow driver who has.  Since the claims of Tigges and Reeves must be "typical," Fed. R. Civ. P. 23(a)(3), of the classes they seek to

---

generally Mark S. Brodin, The British Experience with Hearsay Reform: A Cautionary Tale, 84 Fordham L. Rev. 1417 (2016).

represent, it makes sense to limit Tigges's class to non-signatories and Reeves' class to signatories.

Well, says counsel for the Defendants, if the classes stay limited, this Court has lost subject matter jurisdiction under the Class Action Fairness Act because these limited classes don't meet the statutory requirements.  Mem. Supp. Defs.' Mot. Remand 1, Reeves, ECF No. 27.  This Court notes this concern but expresses no opinion thereon.  This is a subject for further briefing.  For example, does the doctrine of supplementary jurisdiction apply?[33]

---

[33] The Court appreciates defense counsel raising the subject matter jurisdiction so promptly.  This is true professionalism for it was Askew who removed the Reeves case to this Court and then fought tooth and nail to keep it here.

And well he should.  Assume -- as is in fact the case -- the quality of judging is equivalent in the Massachusetts Superior Court and the federal District of Massachusetts.  There are still a number of tactical reasons why the Defendants would choose federal court.  Studies show that if a party can be winkled out of his choice of forum, this generally benefits the opposing party.  See, e.g., Kevin M. Clermont & Theodore Eisenberg, Do Case Outcomes Really Reveal Anything about the Legal System?  Win Rates and Removal Jurisdiction, 83 Cornell L. Rev. 581 (1998) (describing plaintiffs' empirical lack of success in cases that have been removed to federal court; attributing this lack of success to several factors, one of which is a "shift[ing of] biases, inconveniences, . . . and procedural law" in the removing party's favor); William G. Young, Reflections of a Trial Judge 50-53 (1998) (discussing various factors that vary between courts).

Here, the federal jury will be drawn from this Court's Eastern Division -- all the Massachusetts counties east of Worcester.  The state jury will come from the County of Middlesex alone. Plaintiffs' counsel generally think a Middlesex jury is more plaintiff friendly.  Moreover, while a 12-person jury will be empanelled both in the Massachusetts Superior Court

### III.  CONCLUSION

For the foregoing reasons, the Court DENIED the Reeves Defendants' motion to dismiss and ALLOWED Reeves and Tigges' motions to certify their respective classes, albeit to more limited extents.  Elec. Clerk's Notes, <u>Tigges</u>, ECF No. 32; Elec. Clerk's Notes, <u>Reeves</u>, ECF No. 22.

<u>/s/ William G. Young</u>
WILLIAM G. YOUNG
DISTRICT JUDGE

---

and in this session of the federal court, this Court necessarily requires a unanimous verdict, Fed. R. Civ. P. 48(b), while a five-sixths verdict is sufficient in the Superior Court, Mass. Gen. Laws ch. 234, § 34A.  Plaintiffs' counsel generally prefer a five-sixths verdict.

Finally, Massachusetts decisions permit more ways to work around the subsequent repairs evidentiary rule than does Fed. R. Evid. 407.  <u>See</u> <u>Cameron</u> v. <u>Otto Bock Orthopedic Indus., Inc.</u>, No. CIV. A. 92-12510-Y, 1994 WL 51630, at *2 (D. Mass. Jan. 7, 1994), <u>aff'd</u>, 43 F.3d 14 (1st Cir. 1994).  Here, where Askew, over time, increased the variety of ways he notified customers about the delivery charge, this may make a difference.

These straws in the wind all appear to favor a federal forum, from Askew's perspective at least.